# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# EASTERN DIVISION

**IN THE MATTER OF KENNEDY SHEA LEE,**

    *Plaintiff*,

**V.**                                                                          **CASE NO. _____**

**WEAKLEY COUNTY BOARD OF EDUCATION**
**D/B/A WEAKLEY COUNTY SCHOOLS**

                                                            **JURY DEMANDED**

    *Defendant.*

# COMPLAINT

    Kennedy Lee brings this Complaint under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Equal Protection Clause of the Fourteenth Amendment. She shows:

### I.    INTRODUCTION

    1.    This case involves extreme prejudice and insecurity towards persons with disabilities. To the Greenfield High School administration, persons with certain neurological disabilities should be ushered away, not seen, segregated from their peers.

    2.    Putting them in a former storage closet and giving them separate seating at graduation, Greenfield High treats them differently ("discrimination"), recalling a dark time of our nation's past. But that's about to change. Kennedy Lee is taking legal action for Greenfield High's shocking prejudice.

> *Prejudice, we are beginning to understand, rises not from malice or hostile animus alone. It may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves. Quite apart from any historical documentation, knowledge of our own human instincts teaches that persons who find it difficult to perform routine functions by reason of some mental or physical impairment might at first seem unsettling to us, unless we are guided by the better angels of our nature. There can be little doubt, then, that persons with mental or physical impairments are confronted with prejudice which can stem from indifference or insecurity as well as from malicious ill will.*

*Bd. of Trustees v. Garrett*, 531 U.S. 356, 374-375 (2001) (Kennedy, J.).

## II. PARTIES, JURISDICTION, AND VENUE

3. Plaintiff, Kennedy Lee, graduated in May 2024 from Greenfield High School located within Weakley County, Tennessee.

4. Defendant, Weakley County Department of Education, d/b/a Weakley County Schools (WCS), is vested with management and control of the County's public school system. It is the ultimate policy-making body with regard to the operation of the school system. Thus, it is a "public entity" within the meaning of the Americans with Disabilities Act, 28 C.F.R. §35.104, and receives federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. §794(a). The Defendant may be served with process through the superintendent of the Weakley County Schools.

5. This action arises out of the following Federal statutes: The Equal Protection Clause of the Fourteenth Amendment; The Americans with Disabilities Act of 1990 (ADA), Pub. L. No. 101-336, 104 Stat. 327 (1990), 42 U.S.C. §§ 12101, *et seq.*, amended by the Americans with Disabilities Act (ADA-AA) with an effective date of January 1, 2009; the Rehabilitation Act of 1973, §§ 504 and 505, as amended, 29 U.S.C.A. §§ 794 and 794a, including the conforming amendment of the ADA-AA which changes the definition of "disability" under § 504 to conform

to the definition of "disability" under ADA-AA. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §1331.

6. Venue is appropriate in this Court under 28 U.S.C. §1391(b) as the cause of action arose in Weakley County and the Defendant may be found in Weakley County.

### III.   FACTS

#### KENNEDY'S POTS IS A DISABILITY

7. Kennedy Lee has postural orthostatic tachycardia syndrome (POTS), along with a functional neurological disorder. POTS affects Kennedy's heart, blood pressure, and temperature regulation. It is characterized by two factors:

- A specific group of symptoms that frequently occur when standing upright; and

- A heart rate increase from horizontal to standing (or as tested on a tilt table) of at least 30 beats per minute in adults, or at least 40 beats per minute in adolescents, measured during the first 10 minutes of standing. [1]

8. Generally speaking, when Kennedy is upright, blood pools in the lower half of her body, with insufficient return to her brain. Due to POTS, she thus experiences symptoms of fatigue, dizziness, light headedness, and brain fog.[2]

9. Kennedy's POTS is a "disability" as that term is defined by the ADA-AA and Section 504. It is a physical impairment substantially affecting Kennedy Lee's daily living and her internal bodily processes—her circulatory and nervous systems.

---

[1] https://www.hopkinsmedicine.org/health/conditions-and-diseases/postural-orthostatic-tachycardia-syndrome-pots (last visited July 11, 2024).

[2] See footnote 1.

10. For Kennedy, the reasonable accommodations, documented in her 504 Plan with WCS, include *sitting* near a teacher and friend if she has an episode, modification/shortening of assignments if her episodes are too frequent, extended time to complete assignments, and calling for the nurse to attend to her "each time that she goes down."

### THE STORAGE CLOSET

11. Kennedy's 504 Plan did *not* provide for segregation, isolation, and/or removal of her from her regular education classroom. But that is precisely what WCS did every day of her junior year of high school.

12. Rather than abide by the 504 Plan, WCS went to humiliating extremes: it put Kennedy and another student in her grade *who also had POTS* in a former storage closet. WCS cleaned out the closet, then placed two cot beds on each side, one for each student. The nurse sat in the closet too, at a small desk. Here is Kennedy inside the former storage closet at Greenfield High with her cot and books:



13. WCS confined and ostracized Kennedy, and the other student with POTS, to the storage closet for all of their junior year of high school, the 2022-2023 school year, with no access to non-disabled peers, no access to extracurricular activities, no access to special classes like art or music, no access to eating lunch in the cafeteria with peers, no access to use of the library, and limited to no access to teacher instruction in the general education curriculum. WCS gave Kennedy an online curriculum different from and lacking that of her non-disabled peers in the regular education classrooms.

14. WCS claimed the storage closet was necessary to avoid Kennedy's POTS becoming "too much of a disruption to other students." Thus, WCS demonstrated a disability-based animus and extreme prejudice toward the disability—as if it were *best not to even be seen*.

### HOMEBOUND STATUS AND DENIAL OF SCHOOL ACTIVITIES

15. Having suffered the prejudice and indignity of being isolated to the storage closet, and with WCS offering no other viable alternatives, Kennedy went on homebound status for the 2023-2024 school year, her senior year.

16. On homebound status, WCS provided a teacher only twice a week at home for an hour and a half session. WCS claimed that, on homebound, it would inform her of senior year activities and programs. But once on homebound, Kennedy was largely forgotten, with WCS making *little to no* effort to communicate with her about senior year activities. Kennedy remained out of sight, out of mind, unlike her non-segregated peers.

### HIGH SCHOOL GRADUATION

17. As graduation approached, Kennedy looked forward to walking the stage with her classmates. Yet again, WCS created a disability-based barrier: WCS decided that Kennedy, along

with her storage closet-mate with POTS, and another student who experiences seizures, would be sidelined again. This time, they were all put in the bleachers with the audience, not the graduates on the floor who sat in rows of chairs as the distinguished guests of honor. When Kennedy's name was called, she would be wheeled from the bleachers to the stage in a wheelchair. The principal maintained all of this machination was necessary due to Kennedy's disability.

18. When Kennedy heard the plan, she was mortified. She took a letter from her physician addressed to the school showing how she was safe—medically cleared—to walk across a stage and receive her diploma. WCS demurred, with the principal stating: "We will see how [graduation] practice goes."

19. At the practice, the principal permitted Kennedy to walk, but still refused to allow her to sit with her graduating class. She would be segregated. The principal maintained that Kennedy, and the two other students with seizure-related disabilities, *must* be seated away from their classmates, in bleachers with the audience.

20. This decision targeted Kennedy's disability. The principal said WCS did not want Kennedy "falling out" on the gym floor with someone coming down from the audience to rescue or assist her. That, the principal said, would be embarrassing *for the school* if posted on social media. Of course, even to allay these fears, all the principal had to do was seat a nurse on the gym floor in the event of an episode. That would allow all three students to participate with their peers. But the principal would not relent.

21. Kennedy's mother voiced her concerns about the principal's exclusion of Kennedy to Weakley County's Director of Schools. He sympathized, and seemed to agree it was clearly wrong, but he did not step in and fix the principal's segregation of Kennedy or the other students.

6

22.     On the graduation date, Kennedy attended.  The principal had not changed his mind.  Like the storage closet and homebound, she was excluded, to the bleachers.  She watched her graduating classmates file in, while she walked in separately and sat in the bleachers, just as the principal had directed.  The social media embarrassment the principal feared would occur, but sadly, it was Kennedy who would be embarrassed by her separation.

[3]

23.     After graduation, WCS created social media postings of the graduating class of 2024.  Noticeably absent, not even mentioned, were Kennedy and the other two students with disabilities.  This would be the final humiliating act of segregation and exclusion that Kennedy experienced.  Accordingly, she now files this challenge to the public school who deemed her disability unworthy of sight, too dangerous to include, and too embarrassing for association.

### III.  LEGAL CLAIMS

**COUNT ONE:** **42 US.C. § 12131 DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990 WITH AMENDMENTS 2009**

24.     Plaintiffs reallege each paragraph above as if fully set forth herein verbatim.

---

[3]     Photo from posted story in People magazine, *available at* https://people.com/high-school-student-with-disability-felt-robbed-having-to-sit-in-audience-graduation-8653543 (last visited July 11, 2024).

25. "In the ADA, Congress provided [a] broad mandate" to "effectuate its sweeping purpose[ to] ... forbid[] discrimination against disabled individuals in major areas of public life, [including] ... public services ...." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). It is "a milestone on the path to a more decent, tolerant, progressive society." *Id.* (quoting *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring))

26. Title II of the ADA covers programs, activities, and services of public entities.

27. Defendant is a public entity because it is a state or local government or a department or instrumentality of a State or local government.

28. Defendant, from the Director of Schools on down, had knowledge of Kennedy's disabilities entitling her to protection under the ADA.

29. Title II of the ADA prohibits discrimination against any "qualified individual with a disability." It requires reasonable accommodations.

30. Defendant has intentionally, purposefully and/or with deliberate indifference, bad faith, or gross misjudgment, violated the rights of Kennedy secured by the Americans with Disabilities Act of 1990 with Amendments, 42 U.S.C. § 12131 *et seq.* and 28 C.F.R. § 35.130, by:

   a) Segregating Kennedy in violation of the "most integrated setting," the setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).

   b) Refusing to make reasonable modifications ("reasonable accommodations") in policies, practices, or procedures when the modification is necessary to avoid discrimination on the basis of disability, in violation of 28 C.F.R. § 35.130(b)(7);

   c) Excluding Kennedy from participating in and denying her the benefit of

8

Defendant's services, programs, and activities on the basis of her disability, in violation of 28 C.F.R. § 35.130(a); and

    d)    Using criteria or methods of administration that have the effect of subjecting Kennedy to discrimination on the basis of her disability, in violation of 28 C.F.R. § 35.130(b)(3)(i).

**COUNT TWO: DISCRIMINATION IN VIOLATION OF SECTION 504 OF THE REHABILIATION ACT, 29 U.S.C. § 794**

31.    Plaintiff realleges each paragraph above as if fully set forth herein verbatim.

32.    From the Director of Schools on down, Defendant has acted with deliberate indifference, bad faith, gross misjudgment and/or with intentional discrimination to the rights of Kennedy Lee secured by Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 and 34 C.F.R. § 104.4, by:

    a)    Excluding, isolating and segregating Kennedy to a storage closet, homebound, and the bleachers.

    b)    Failing to reasonably accommodate Kennedy's disability. 28 CFR § 35.130(b)(7)(i)(2001); *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (Section 504).

    c)    Denying Kennedy, because of her disability, the opportunity to participate in, and benefit from, federally assisted education services, programs and activities, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);

    d)    Subjecting Kennedy to discrimination on the basis of the nature and severity of her disability, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(a);

    e)    Using criteria or methods of administration that have the effect of subjecting Kennedy to discrimination on the basis of disability, in violation of 34 C.F.R. § 104.4(b)(4).

## **COUNT THREE: DISABILITY-BASED BULLYING AND HARASSMENT**

33. Additionally, under Section 504 and the ADA, Kennedy has suffered disability-based bullying and harassment that arises from the nature of her disability; in addition to the constant (daily) segregation, she experienced acts of intimidation, ridicule and insult by students. This was sufficiently pervasive (it was constant); it was severe to a reasonable high school student; and it impacted her education by altering the conditions of her educational experience.

34. Long *before* the graduation, WCS created vulnerabilities that led to further misconduct. WCS resented the nature of Kennedy's disability, intentionally segregating her and another student with POTS to the former closet. Thus, it not only had actual knowledge of the disability, it *created* the harassing condition, stigmatizing Kennedy on a daily basis, a clear act of deliberate indifference.

35. And *after* putting Kennedy and the other student with POTS in the storage closet, WCS did not take any corrective action. Instead of taking corrective action, it was the entity engaging in the actual harassment, a clear act of deliberate indifference.

36. Foreseeably, WCS's actions in segregating and isolating Kennedy created ridicule from others. Students obviously knew that she and another student were relegated to the storage-closet students due to disability. And they made fun of her regularly, without any discipline or corrective action. Eventually, Kennedy left in-person schooling altogether to escape the harassment. For all these reasons, Kennedy was unlawfully discriminated against (harassment) because of her disability in violation of both Title II of the ADA and §504 of the Rehabilitation Act 1973.

## COUNT FOUR: SECTION 1983 AND THE FOURTEENTH AMENDMENT'S EQUAL PROTECTION CLAUSE

37. Plaintiffs reallege each paragraph above.

38. Separate and parallel actions may be brought under the ADA and the Fourteenth Amendment's Equal Protection Clause. *Bullington v. Bedford Cty,* 904 F.3d 467, 472 (6th Cir. 2018). Plaintiff does so here.

39. Section 1983 codified the Civil rights Act of 1871. Local governmental entities may be sued under Section 1983 when their policies, customs or practices caused the constitutional injury or federally protected right. Specifically, Section 1983 provides a cause of action for an individual whose constitutional or federal rights are violated by those acting under color of state law:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. Put even more simply, the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).

40. Kennedy is a United States citizen with rights under Section 1983. And Defendant is a local governmental entity who may be sued under Section 1983. The actions of the Defendant were committed under "color of law," with at *least* the appearance that the government (the Director of Schools and Principal) deprived Kennedy of a right secured by the Constitution (the Fourteenth Amendment's Equal Protection Clause) or the laws of the United States (the ADA

and Section 504).

41. Kennedy asserts that Defendant's policy, custom or practice of sidelining persons like her—with mobility disabilities and/or POTS—caused her to be treated differently from her non-disabled peers who were not excluded. This extends from classroom instruction to extracurricular activities to graduation ceremonies.

42. Under *Monell*[4] liability, the Defendant is liable for its own misconduct for which it participated—through its policies, customs or practices. The Defendant has such policies, customs or practices, ones that did *cause* Kennedy's injury in the following ways.

43. First, while Defendant has *paper* policies purporting to uphold the rights of persons with disabilities, including their rights to reasonable accommodations, in actual practice, Defendant has a *custom* of denying such rights to persons with disabilities, and instead excluding them from equal treatment, specifically including POTS. Defendant has used this policy or custom of discrimination to treat Kennedy differently, constantly throughout her junior and senior years, along with at least one other student with POTS in Kennedy's grade. These actions amount to deliberate indifference and animus toward Kennedy's disability, a custom of tolerating or acquiescence to federal rights violations.

44. Second, Defendant's personnel with final policy making authority (i.e. its Principal and Director of Schools) permeated and/or ratified illegal actions of denying Kennedy's rights to equal treatment through a policy that Kennedy's disability must not be seen, lest she be "too disruptive" or "embarrassing" to non-disabled students or the school itself. At its highest level, the Director of Schools, WCS acquiesced and ossified Kennedy's segregation and isolation from

---

[4]   *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

her non-disabled peers.

45. Third, Defendant has failed to train or supervise employees within the school (Director of Schools, principals, teachers, nurses). It is abundantly clear that broader training for WCS employees on the *Olmstead* principle of most integrated setting, along with necessity of reasonable modifications/accommodations to school environments for persons with disabilities was inadequate or was not provided. To prevent the type of harm repeatedly suffered by Kennedy, WCS must become trained about the harm of unequal treatment, segregation, and failure to provide accommodations.

46. Throughout, Kennedy was treated markedly differently than her similarly situated peers. Her non-disabled peers received access to their academic classes and extracurricular activities while she, unlike them, was kept in a storage closet, placed on homebound status, and sidelined for graduation. WCS succeeded in stigmatizing her due to her disability.

47. As a direct and proximate consequence of Defendant's intentional and/or deliberately indifferent conduct, Kennedy has suffered damages, including without limitation, violations of her constitutional rights, physiological injury, emotional anxiety, fear, and suffering.

## COUNT FIVE: FOURTEENTH AMENDMENT'S SUBSTANTIVE DUE PROCESS AND SECTION 1983

48. Plaintiffs reallege each paragraph above as if fully set forth herein verbatim.

49. The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

50. This second component of the Fourteenth Amendment's due process clause, substantive due process, protects certain inalienable rights and bars certain governmental actions

regardless of the procedures used to implement those actions. It includes the right to personal security and bodily integrity.

> The right to personal security and to bodily integrity bears an impressive constitutional pedigree. As far back as 1891, the Supreme Court recognized that "no right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."

*Doe v. Claiborne County*, 103 F.3d 495, 506 (6th Cir. 1996).

51. Where state actors increase the danger to the victim, the municipality may be liable under the state-created danger doctrine. Here, WCS required Kennedy to attend school and graduation, but forced her into unaccommodating and exclusionary spaces: the storage closet, homebound, and the bleachers. WCS knew that such unaccommodated exclusionary spaces were causing Kennedy to experience a cumulative physiological harm, mounting trauma, and/or dignitary harm, day after day, for months and even years on end. That is, WCS was "restraining" Kennedy by forcing her into situations that strip her bodily security and integrity, and it did so with regularity. These actions were undertaken with deliberate indifference, were arbitrary and capricious and shock the conscious.

## IV. RELIEF SOUGHT

52. For relief, Plaintiffs seek a judgment that WCS violated the ADA, Section 504, and the Constitution, as reflected above.

53. Kennedy seeks prospective relief/injunctive relief that includes training of persons about the harm of segregation, the integration mandate, and the rights to reasonable accommodation. She seeks compensatory damages for physiological injury, mental injury, pain and anguish, loss of dignity, along with reputational and consequential damages.

54. Plaintiff also seek their reasonable attorneys' fees and costs, and expenses under 42 U.S.C. §12205 and §1988; and any further and just relief.

55. A jury is demanded.

Respectfully submitted,

**GILBERT LAW, PLLC**

/s Justin S. Gilbert
JUSTIN S. GILBERT (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423-756-8203
justin@schoolandworklaw.com

&

**THE SALONUS FIRM, PLC**

/s Jessica F. Salonus
JESSICA F. SALONUS (TN Bar No. 28158)
139 Stonebridge Boulevard
Jackson, TN 38305
Telephone: 731-300-0970
jsalonus@salonusfirm.com